UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AGILITY PUBLIC WAREHOUSING<br>COMPANY K.S.C., a/ka<br>AGILITY or THE PUBLIC<br>WAREHOUSING COMPANY, | ) ) ) ) ) | |
| Plaintiff, | ) | Case No. 1:14-cv-0946-BAH |
| v. | ) ) ) | |
| NATIONAL SECURITY AGENCY, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF DAVID J. SHERMAN

I, DAVID J. SHERMAN, hereby declare and state:

1.      I am the Associate Director for Policy and Records at the National

Security Agency ("NSA" or "Agency"), an intelligence agency within the Department of

Defense.  I have been employed with NSA since 1985.  Prior to my current assignment, I

held various senior and supervisory positions at NSA and elsewhere in the Executive

Branch, to include serving as the Deputy Chief of Staff in the Agency's Signals

Intelligence Directorate, its representative to the Department of Defense, Deputy

Associate Director for Foreign Affairs, and Director for Intelligence Programs at the

National Security Council.  As the Associate Director for Policy and Records, I am

responsible for, among other things, the processing of all requests made pursuant to the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for NSA records.

2.      In addition, I am a TOP SECRET original classification authority pursuant

to Section 1.3 of Executive Order ("E.O.") 13526, dated 29 December 2009 (75 Fed.

Reg. 707). It is my responsibility to assert the FOIA exemptions over NSA information in the course of litigation. Through the exercise of my official duties, I have become familiar with the current litigation arising out a request for information filed by Plaintiff.

3. The purpose of this declaration is to explain how NSA processed the FOIA request submitted by Plaintiff. As further discussed in detail below, NSA conducted a search for records responsive to the Plaintiff's FOIA request, but ultimately could not locate any records responsive to this request despite conducting a reasonable search.

4. In addition, this declaration will explain to the Court that to the extent Plaintiff's FOIA request seeks intelligence records on the PWC or its directors, officers, or employees, then NSA cannot acknowledge the existence or nonexistence of such records because the existence or nonexistence of such records is a current and properly classified matter in accordance with Executive Order 13526 and thus exempt from disclosure under the FOIA based upon Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(1). The existence or nonexistence of this information is likewise protected from release by statutes, specifically Section 6 of the National Security Agency Act of 1959 (Pub. L. No. 86-36, codified at 50 U.S.C. § 3605), Section 102(A)(i)(1) of the Intelligence Reform and Prevention Act of 2004 (codified at 50 U.S.C. § 3024), and 18 U.S.C. § 798.

### ORIGIN AND MISSION OF NSA

5. The NSA was established by Presidential Directive in October 1952 as a separately-organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense. NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals

intelligence ("SIGINT") information, of which communications intelligence ("COMINT") is a significant subset, for foreign intelligence and counterintelligence purposes to support national and departmental missions to include the conduct of military operations. *See* E.O. 12333, section 1.7(c), as amended.

6.     In performing its SIGINT mission, NSA exploits foreign signals to obtain intelligence information necessary to the national defense, national security, and/or the conduct of foreign affairs.  NSA has developed a sophisticated worldwide SIGINT collection network that acquires foreign signals.  The technological infrastructure that supports NSA's SIGINT collection network has taken years to develop at a cost of billions of dollars and untold human effort.  It relies on sophisticated collection and processing technology.

## IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

7.     There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary to counter threats to the nation and its allies. The second reason is to obtain the information necessary to direct the foreign policy of the United States. Foreign intelligence information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President, the President's National Security Advisor; the Director of National Intelligence; the Secretaries of Defense, State, Treasury, and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and Specified Commanders.  In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency; the Federal Bureau of Investigation; the Drug

Enforcement Administration; the Departments of the Army, Navy, and Air Force; and various intelligence components of the Department of Defense. Information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics and trafficking. This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

8.     NSA's ability to produce SIGINT information depends on its access to foreign signals. Further, SIGINT capabilities are both expensive and fragile. Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals.

9.     Information obtained from intercepted foreign communications is called communications intelligence ("COMINT"), a subset of SIGINT information. NSA's COMINT efforts constitute only part of the functions and activities of the Agency. A fundamental tenet of the COMINT process is that the identity of specific communications whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting these targets, and the vulnerability of particular foreign communications are all matters that must be maintained in strictest secrecy because of the fragility of the ability to exploit foreign communications. Disclosure of the identity of the targets, the ability to exploit those targets, or the vulnerability of particular foreign communications would encourage countermeasures by the targets of NSA's COMINT efforts. Disclosure of even a single intercepted communication holds the potential to

reveal the intelligence collection techniques that are applied against targets around the world. Once alerted, COMINT targets may change the way they communicate, which could inhibit access to the target's communications, and therefore, deny the United States access to information crucial to the defense of the United States, both at home and abroad. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost unless and until NSA can establish new and equivalent exploitation of that target's signals. If a source becomes unavailable, the military, national policymakers, combatant commanders, and the Intelligence Community ("IC") must operate without the information the signals provided. Such losses are extremely harmful to the national security of the United States.

10. Congress has specifically recognized the inherent sensitivity of the SIGINT activities of the NSA; thus, Congress has passed statutes to protect the fragile nature of NSA's SIGINT efforts. These statutes recognize the vulnerability of signals intelligence to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers, combatant commanders, and the IC. These statutes are: Section 6 of the National Security Act of 1959 (codified at 50 U.S.C. § 3605); Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024); and 18 U.S.C. § 798. Under these three statutes, NSA is specifically authorized to protect certain information concerning its activities and its intelligence sources and methods from public disclosure.

## NSA'S FOIA POLICY AND PROCEDURE

11.     NSA responds to all perfected FOIA requests in compliance with the law
and in a manner that is both fair and reasonable to each requester.  In order to implement
this policy, NSA has implemented a "first-in, first-out" system for processing FOIA
requests made directly to the NSA as well as referrals and consultations from other
agencies.  Currently, the NSA has two processing queues that are processed on this "first-
in, first-out" basis—an easy queue and a complex queue.

12.     When the NSA FOIA Office receives a perfected FOIA request, it assigns
a case number to the request and logs the request into the Agency's FOIA database.  A
member of the FOIA Office then searches the databases to determine if a prior request
seeking similar information would help speed the process of the current request, either
because the same information has already been processed for potential release or the
request is higher in the relevant "first-in, first-out" queue.  If no identical or similar case
is found, the FOIA intake office identifies those organizations within the agency the staff
believes are most likely to have responsive material.  The staff then sends a search
request or a search cost estimate to these organizations, depending on the requester's fee
status.

13.     Upon receiving a search request, each organization conducts a search for
responsive documents.  Each organization may further task subordinate offices to search
for responsive records.  Both electronic and paper searches are conducted for the FOIA
requests.  If and when responsive documents are located, they are forwarded by the
tasked organizations to the FOIA Office.  Upon receiving the records, the FOIA Office
determines which of the two queues (easy or complex) the request should be assigned,

which is based upon the volume, complexity, and classification level of the responsive material.

14.    When the request comes up for processing in either of the two "first-in, first-out" queues, a case officer begins a review of the material for exempt and non-exempt information to include whether any meaningful, non-exempt information can be segregated from the exempt information or whether the information must be withheld in its entirety.  The NSA's FOIA Office has a full-time staff specifically trained in and devoted to conducting this review, and this staff consists of a cadre of experienced former intelligence analysts who are extremely knowledgeable of NSA's mission, functions, and activities.  Ultimately, responsive material undergoes a multi-level review before a final decision is made regarding its release or withholding either in full or in part to ensure proper processing of the material under the FOIA.

## PLAINTIFF'S FOIA REQUEST

15    By letter dated December 19, 2013, which the Agency received on December 31, 2013, Plaintiff[1], through its counsel, submitted a FOIA request consisting of the following seven bullets/items (hereinafter "items"):

> (1)    All email, letter, telephonic, or other communications, or recordings of such communications, by PWC or its directors, officers, or employees.  This request includes, without limitation, any such communications in the NSA's possession, including without limitation any communications that were intercepted by the NSA (including, without limitation, through the NSA's XKeyscore Program), any other U.S. or foreign government agency, or any U.S. or foreign communications provider (such as Google, Yahoo, Verizon, or AT&T).

---

[1] Throughout this declaration, particularly when discussing the administrative processing of this FOIA request, I refer to the Plaintiff and Plaintiff's counsel collectively as "Plaintiff."

(2)  The names of any U.S. or foreign communications providers that intercepted email, letter, telephonic, and/or other communications by PWC or its directors, officers, or employees.

(3)  Any and all documents related to the following contracts between PWC and the Defense Supply Center Philadelphia ("DSCP"): Contract SP0300-03D-3061 (awarded on May 28, 2003); Contract SPM300-05-D-3119 (awarded on February 16, 2005); and Contract SPM300-05-D-3128 (awarded on November 16, 2004).

(4)  Any and all documents related to the following lawsuits: *U.S. ex. rel. Kamal Mustafa Al-Sultan v. The Public Warehousing Company K.S.C.*, Case No. 1:05-CV-2968 (N.D. Ga. 2005); and *United States v. The Public Warehousing Co. K.S.C.*, Case No. 1:09-CR-490-TWT/AJB (N.D. Ga. 2009).

(5)  All email, letter, telephonic, or other communications, or recordings of such communications between the NSA and any other law enforcement agency, including the Department of Justice ("DOJ"), and the Federal Bureau of Investigation ("FBI"), regarding PWC or any of its directors, officers, or employees.

(6)  Any memoranda, meeting minutes, reports, manuals, or other documents discussing or pertaining to any meetings between employees or contractors of any or all of the DOJ, the Office of the Director of National Intelligence ("ODNI"), and the NSA, which mention or relate to PWC.

(7)  Any memoranda, meeting minutes, reports, manuals, or other documents discussing or pertaining to any meetings between employees or contractors of the NSA and employees or contractors of other investigative or law enforcement agencies, including but not limited to the FBI, the Central Intelligence Agency ("CIA"), the Department of Defense ("DOD") and the Department of Homeland Security ("DHS"), relating to or mentioning PWC. **TAB 1**.

16.  By email dated January 6, 2014, NSA's FOIA Office informed Plaintiff that NSA had received Plaintiff's request, which it had assigned as Case Number 76091. **TAB 2**. Additionally, the NSA FOIA office informed Plaintiff that before the agency could begin processing this request, it needed additional information and clarification. Specifically, for determining Plaintiff's fee category, NSA's FOIA Office needed to know if the requester, a law firm, was representing a person or company. Second, the

NSA FOIA Office sought clarification (a time frame and topic) for Plaintiff's request for "meetings among employees or contractors of any or all of the DOJ, the ODNI, and the NSA, which mention or relate to the PWC." **TAB 2**.

17.    Further, the FOIA Office informed Plaintiff that the Agency would hold the request in abeyance until the Plaintiff responded, and if the FOIA Office did not receive a response within 30 days of this email, then it would assume Plaintiff was no longer interested in pursuing this request, whereupon the Agency would administratively close this case.

18.    By letter dated January 27, 2014, Plaintiff filed an appeal regarding its December 19, 2013 request (NSA assumes that Plaintiff was not aware of NSA's email seeking clarification and holding request in abeyance pending a response from Plaintiff) alleging a constructive denial of its FOIA request. **TAB 3**.

19.    Two days later, on January 29, 2014, Plaintiff's counsel responded to the NSA FOIA Office's January 6th email seeking information and clarifying details about item #6 (meetings among employees or contractors of any or all of the DOJ, the ODNI, and the NSA, which mention or relate to the PWC.). **TAB 4**.  Specifically, Plaintiff's counsel indicated that it was representing Agility Public Warehousing Company, a company based in Kuwait.  Additionally, Plaintiff limited the scope of item #6 to a timeframe of January 1, 2005 to the present and the topic to "any discussions regarding PWC between the DoJ and the ODNI or the NSA."  Finally, Plaintiff's counsel withdrew the administrative appeal of January 27, 2014, provided that NSA's FOIA office closed the appeal without prejudice. **TAB 4**.

20.     By letter dated January 31, 2014, the NSA FOIA Office provided its initial response to Plaintiff's FOIA request, as Plaintiff provided the requested information and clarification that would enable the agency to process this FOIA request. **TAB 5**. In this letter, the FOIA Office informed Plaintiff, among other things, that there was a significant increase in the number of FOIA requests sent to the Agency, and there were delays in processing FOIA requests. The letter further informed Plaintiff that the Agency processes FOIA requests on first-in, first-out basis and that it would process Plaintiff's request as soon as it was able to do so based on this basis. **TAB 5**.

21.     By letter dated March 14, 2014, Plaintiff informed the Agency that if it did not process its FOIA request by April 11, 2014, then it would deem that the Agency had constructively denied its FOIA request. **TAB 6**.

22.     By letter dated April 15, 2014, Plaintiff filed an appeal alleging that the Agency had constructively denied its FOIA request. **TAB 7**.

23.     By letter dated April 25, 2014, the NSA FOIA Appeals Program Manager responded to Plaintiff and informed it that an appeal number had been assigned to the case, that a large number of appeals were ahead of Plaintiff's appeal in NSA's appeal queue, and that appeals are processed in the order in which they are received. **TAB 8**.

24.     On June 6, 2014, Plaintiff filed the instant Complaint for Injunctive Relief. At that time, the agency had not processed Plaintiff's appeal based on its placement in the first-in, first-out appeal queue. Plaintiff's civil action terminated the administrative processing of Plaintiff's appeal.

25.     On July 18, 2014, NSA's Chief of the FOIA/Privacy Act Office provided a final response to Plaintiff's FOIA request. **TAB 9**. In this letter, the Agency informed

Plaintiff that there were no fees assessed by the Agency in processing this FOIA request. The Agency further informed Plaintiff that it conducted a search for contract-related information to include internal and external NSA communications related to the contracts referenced in the Plaintiff's request, but despite this search, it could not locate any responsive records. **TAB 9**. The Agency also noted that the contract numbers provided by Plaintiff in its request were not NSA contract numbers. **TAB 9.**

26.     Additionally, in this final response letter, the Agency informed Plaintiff that it searched for records related to the lawsuits cited in Plaintiff's FOIA request, to include internal or external communications related to those lawsuits, but no responsive records were located[2]. **TAB 9**. Finally, the Agency informed Plaintiff that to the extent that any portion of its request sought intelligence information, to include intercepts, then the fact of the existence or nonexistence of this information is a currently and properly classified matter in accordance with E.O. 13526 and thus exempt from release based on Exemption 1 of the FOIA. **TAB 9**. Likewise, the Agency informed Plaintiff that the existence or nonexistence of intelligence information pertaining to the Plaintiff was protected from release by statutes, and thus exempt based on Exemption 3 of the FOIA. **TAB 9**.

## <u>NSA'S SEARCH FOR RESPONSIVE RECORDS</u>

27.     As stated above, the NSA interpreted Plaintiff's FOIA request as seeking two categories of information: records related to specific contracts related to Plaintiff and internal or external communications pertaining to Plaintiff as they relate to the specified contracts in the NSA's possession and control; and information related to

---

[2] NSA does not consider Plaintiff's FOIA request to be a responsive record although it references the lawsuits sought by the Plaintiff. This FOIA request is maintained by both the FOIA Office and the Office of General Counsel (since a civil action was filed related to this request).

lawsuits involving Plaintiff and internal and external communications pertaining to the Plaintiff as they relate to the specified lawsuits in the NSA's possession and control.[3] Accordingly, the Agency tasked its Office of General Counsel, its acquisition organization, and its logistics organization to search for any records that mention Agility Public Warehousing Company, K.S.C. (c), d/b/a and f/ka/a PWC Logistics Services K.S.C. (c); and the contract numbers SP0300-03-D-3061 (awarded May 28, 2003), SPM300-05-D-3119 (awarded on February 16, 2005), and SPM300-05-D-3128 (awarded on November 16, 2004). These three organizations are the organizations within the NSA that would possess records responsive to the Plaintiff's FOIA request, if any such records existed. These three organizations are the only organizations that would maintain contract-related records and/or litigation records responsive to Plaintiff's FOIA request. NSA creates, maintains and preserves information as records, regardless of format, that document the transaction of business, policies, decisions, procedures and essential operational, logistical and support transactions. NSA meets this obligation using National Archives and Records Administration-approved record management guidelines. At NSA, the Office of General Counsel is responsible for maintaining all litigation files. Regarding contract-related information, NSA's acquisition and logistics organizations are responsible for maintaining contract-related information. All three organizations conducted a search using Plaintiff's name and contract numbers, but did not locate any responsive records to include memoranda, meeting minutes, reports, manuals, or other documents concerning contracts related to Plaintiff or litigation files regarding Plaintiff. Within the Office of General Counsel's Litigation Practice Group, attorneys searched

---

[3]     To the extent Plaintiff's FOIA request seeks intelligence records, the NSA's response is discussed below.

individual Microsoft Outlook email accounts and office administrative personnel and paralegals searched litigation filing systems. Likewise, the acquisition and logistics organizations searched their respective filing systems using Plaintiff's name and contract numbers as search terms. Additionally, the Agency searched its contracting management information system database that supports the NSA's Contracting Activity. This database is used to generate pre-solicitation documents, award contracts, modify contracts and generate management reports. NSA searched this database using the Plaintiff's name and contract numbers. No responsive records pertaining to contracts or litigation involving the Plaintiff were located. Since searches within these three organizations and databases did not produce any responsive litigation and/or contract-related documents pertaining to the Plaintiff, it is unlikely that any documents responsive to the Plaintiff's FOIA request are in the possession of the NSA. Further, any additional searches would not be reasonable as they would be random searches within organizations using the Plaintiff's name, and these random searches would unlikely locate a record since they are not responsible for acquisition or litigation matters on behalf of the agency. Such a search would be looking for the proverbial "needle in the haystack," and would not be reasonable given the Agency's structure and organization.

## NSA'S GLOMAR[4] DETERMINATION

28.     To the extent that Plaintiff's FOIA request seeks intelligence records related to Agility Public Warehousing Company or its directors, officers, or employees

---

[4]     A decision neither to confirm nor deny the existence of information requested pursuant to the FOIA is commonly known as a "Glomar" response in reference to the subject of a FOIA request for records pertaining to a ship, the "Hughes Glomar Explorer." *See Phillipi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976). In such cases, NSA does not conduct a search for responsive records. Conducting a search for records is inappropriate and unnecessary because regardless of the search results, the requester will be informed that the existence or non-existence of the requested records can neither be confirmed nor denied.

(hereinafter "APWC"), NSA's appropriate response to such a request is to state that it cannot acknowledge the existence or nonexistence of such records—NSA simply cannot confirm publicly in any particular case whether or not any communications were collected or, conversely, that no such collection occurred.

29.     Based on my position as the Associate Director for Policy and Records, the Agency official responsible for the processing of all requests made pursuant to FOIA, I am confident that NSA's determination that it could not acknowledge the existence or non-existence of intelligence information on APWC was proper because a positive or negative response to this request would reveal information that is currently and properly classified in accordance with Executive Order ("E.O.") 13526 and is protected from disclosure by statute.

## INTELLIGENCE INFORMATION IS CLASSIFIED AND THUS FALLS UNDER FOIA EXEMPTION 1

30.     Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized – under criteria established by an Executive Order – to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive Order. The current Executive Order that establishes such criteria is E.O. 13526.

31.     Section 1.4 of E.O. 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information. The category of classified information at issue here is Section 1.4(c), which includes intelligence activities (including covert action), intelligence sources and methods, or cryptology. Acknowledgment of the existence or

non-existence of intelligence information referencing Plaintiff would reveal information that is currently and properly classified as set forth in Section 1.4(c) of E.O. 13526.

32.    Acknowledging the existence or non-existence of responsive records would disclose information that is currently and properly classified TOP SECRET pursuant to Section 1.2(a)(1) of E.O. 13526 because such a positive or negative response reasonably could be expected to cause exceptionally grave damage to the national security.  Any disclosure of this information would obviously and immediately affect the ability of NSA to counter threats to the national security of the United States.

33.    Acknowledging the existence or non-existence of responsive records on particular individuals or organizations subject to surveillance would provide our adversaries with critical information about the capabilities and limitations of the NSA, such as the types of communications that may be susceptible to NSA detection. Confirmation by NSA that a specific person's or organization's activities are not of foreign intelligence interest or that NSA is unsuccessful in collecting foreign intelligence information on their activities on a case-by-case basis would allow our adversaries to accumulate information and draw conclusions about NSA's technical capabilities, sources, and methods.  For example, if NSA were to admit publicly in response to an information request that no information about Corporations X or Y exists, but in response to a separate information request about Corporation Z state only that no response could be made, this would give rise to the inference that Corporation Z is or has been a target. Over time, the accumulation of these inferences would disclose the targets and capabilities, and therefore the sources and methods, of NSA's SIGINT activities and

functions and inform our adversaries of the degree to which NSA is aware of some of their operatives and/or can successfully exploit particular communications.

34.     NSA cannot respond to each case in isolation, but must acknowledge that our adversaries may examine all released information together. This compilation of information, if disclosed, could reasonably be expected to cause exceptionally grave and irreparable damage to the national security by providing our adversaries a road map that instructs them on which communication modes or personnel remain safe or are successfully defeating NSA's capabilities. Our adversaries could exploit this information in order to conduct their activities more securely, to the detriment of the national security of the United States. Specifically, our adversaries may employ countermeasures such as changing the way they communicate to avoid or degrade NSA's ability to collect and/or analyze their communications. Any public confirmation by NSA that it does not have intelligence records, for example, would alert targets that their existing means of communications are potentially safe and visa-versa. Changes in the ways that foreign targets communicate, which may occur if NSA publicly confirms whether or not it has intelligence records on a particular person, organization, etc. could be expected to cause exceptionally grave and irreparable damage to the national security because the sources and methods of NSA's SIGINT activities would be jeopardized.

35.     For these reasons, the fact of the existence or non-existence of the information concerning the specific targeting of individuals/organizations is a currently and properly classified matter in accordance with E.O. 13526, and thus Plaintiff's FOIA request is properly denied pursuant to FOIA Exemption 1. *See People for the Am. Way Found. v. Nat'l Sec. Agency*, 462 F. Supp. 2d 21, 27 (D.D.C. 2006).

## INTELLIGENCE INFORMATION IS PROTECTED FROM DISCLOSURE BY STATUTE AND THUS FALLS UNDER FOIA EXEMPTION 3

36.    Section 552(b)(3) of the FOIA provides that the FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3). Review of the application of Exemption 3 statutes consists solely of determining that the statute relied upon qualifies as an Exemption 3 statute and that the information withheld falls within the scope of the statute.

37.    The information at issue here falls squarely within the scope of several statutes. Information about NSA's SIGINT efforts directly relates to the Agency's core functions and activities and to intelligence sources and methods. As described above, Congress enacted these three statutes to protect the fragile nature of NSA's SIGINT efforts, including but not limited to, the existence and depth of signal intelligence-related analytical successes, weaknesses, and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures and the significance of the potential loss of valuable intelligence information to national policymakers, combatant commanders, and the IC.

38.    The first of these statutes is a statutory privilege unique to NSA. NSA's statutory privilege is set forth in Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605. Section 6 of the NSA Act provides that **"[n]othing in this chapter or any other law ... shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the**

**activities thereof, ....**" (emphasis added). By this language, Congress expressed its finding that disclosure of any information relating to NSA activities is potentially harmful. The courts have held that the protection provided by this statute is, by its very terms, absolute. *See, e.g., Linder v. Nat'l Sec. Agency*, 94 F.3d 693 (D.C. Cir. 1996). Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities. *See Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1390 (D.C. Cir. 1979); *see also Larson v. Dep't of State*, 565 F.3d 857, 868 (D.C. Cir. 2009); *Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001); *People for the American Way Found. v. Nat'l Sec. Agency*, 462 F. Supp. 2d 21, 30 (D.D.C. 2006). Further, while in this case the harm would be exceptionally grave, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege; rather, NSA need only to show that the information relates to its activities. *Larson,* 565 F.3d at 868. To invoke this privilege, NSA must demonstrate only that the information it seeks to protect falls within the scope of Section 6. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

39. The second applicable statute is 18 U.S.C. § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States, or (ii) obtained by the process of communications intelligence derived from the communications of any foreign government. The term "communication intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and the

obtaining of information from such communications by other than the intended recipients."

40. The third applicable statue is Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, which states that "[t]he Director of National Intelligence shall protect the intelligence sources and methods from unauthorized disclosure." NSA, as a member agency of the U.S. IC, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute. *See Cent. Intelligence Agency v. Sims*, 471 U.S. 159 (1985). Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024. *Id.*

41. As described above, Congress has enacted three statutes to protect the fragile nature of NSA's SIGINT efforts, to include but not limited to, the existence and depth of signals intelligence-related successes, weaknesses and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures and the significance of the loss of valuable intelligence information to national policymakers and the Intelligence Community. Given that Congress specifically prohibited the disclosure of information related to NSA's functions and activities and its communications intelligence activities, as well as the sources and methods used by the Intelligence Community as a whole, I have determined that NSA's SIGINT activities and functions, NSA communications intelligence activities, and its intelligence sources and methods, would be revealed if NSA confirmed or denied the existence of information responsive to Plaintiff's FOIA request seeking intelligence information on APWC

42.   Specifically, whether or not NSA had records regarding Plaintiff, excluding contracts and contract-related records such as meeting notes, reports, etc. and litigation-related records for lawsuits mentioned in Plaintiff's request, would reveal a function of the NSA and information related to its activities. In this case, the information Plaintiff seeks directly relates to a core function of the NSA-its SIGINT mission-and to NSA's activities in undertaking that function.   Who NSA targets for collection in undertaking its SIGINT mission certainly qualifies as an "activity" of the NSA and is in furtherance of its SIGINT mission.   Accordingly, the fact of the existence or nonexistence of intelligence records concerning the Plaintiff falls squarely with the scope of protection afforded by Section 6 of the National Security Agency Act.  This remains the case even with records of meetings about or discussions of Plaintiff with other government agencies such as the ODNI, CIA, and so forth. Any confirmation that NSA does or does not have such records (meeting notes, reports, etc.), given that NSA is a SIGINT agency, would reveal whether or not NSA has an intelligence interest in Plaintiff. Again, any confirmation of who is or is not of foreign intelligence interest to the NSA is directly related to a function of the NSA, here its SIGINT mission, and the activities of the NSA in furtherance of its SIGINT mission.   This same public confirmation would reveal the sources and methods of NSA's collection under its SIGINT authority, which is afforded absolute protection.

43.   Likewise, acknowledging the existence or nonexistence of intelligence records on Plaintiff would reveal the procedures and methods by which NSA collects or attempts to collect foreign communications pursuant to its SIGINT mission.  Such a

disclosure of the communications intelligence activities is protected from forced public release under the FOIA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __18__ day of September, 2014, pursuant to 28 U.S.C. § 1746.

Dr. David J. Sherman
Associate Director for Policy and Records,
National Security Agency

21